## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 10 2018, 7:34 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Patricia C. McMath
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of J.Z. (Minor Child) and<br><br>J.C. (Father),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner* | July 10, 2018<br><br>Court of Appeals Case No.<br>11A04-1712-JT-2919<br><br>Appeal from the Clay Circuit Court<br><br>The Honorable Joseph D. Trout, Judge<br><br>Trial Court Cause No.<br>11C01-1701-JT-16 |

**Crone, Judge.**

## Case Summary

J.C. ("Father") appeals the involuntary termination of his parental rights to his child J.Z. ("Child"). He argues that the trial court committed clear error in concluding that there is a reasonable probability that the reasons for Child's placement outside his home will not be remedied and that termination of the parent-child relationship is in Child's best interests. Finding no error, we affirm.

## Facts and Procedural History

In March 2015, C.Z. ("Mother"), who was married but separated from her husband, gave birth to Child. Child lived with Father's mother ("Grandmother"). Sometimes Father stayed at Grandmother's home for a day or two at a time, but he mostly lived with his father. Father was not acting as Child's father or caretaker. Tr. Vol. 2 at 143. Grandmother acted as Child's primary caretaker.

In November 2015, the Indiana Department of Child Services ("DCS") received a report that Child had a sore on his bottom infected from stool and that there was possible methamphetamine use in Grandmother's home. On December 19, 2015, DCS removed Child, then nine months old, from Grandmother's home after Grandmother tested positive for methamphetamine, amphetamine, and marijuana and her live-in boyfriend tested positive for methamphetamine. Child was placed in foster care where he has remained. Child was diagnosed with asthma and a peritoneal rectal fistula, which required

three surgeries and a colonoscopy. On December 22, 2015, DCS filed a petition alleging that Child was a child in need of services ("CHINS"). The CHINS petition identified Father as Child's alleged father but acknowledged that paternity had not been established. Father was given notice of the initial detention hearing, but he did not appear.

[4] On February 26, 2016, the trial court held a factfinding hearing. Father did not appear. Mother admitted that Child was not receiving proper medical care, that there was methamphetamine use in Grandmother's home where Mother allowed Child to live, and that Mother was not prepared to care for Child. DCS Ex. 4. The trial court adjudicated Child a CHINS.

[5] On March 18, 2016, DCS amended the CHINS petition to remove Father from the petition and identify Mother's husband as Child's father. DCS Ex. 5. On March 23, 2016, DCS amended the CHINS petition to name Father as Child's alleged father and Mother's husband as Child's legal father. DCS Ex. 6. On March 24, 2016, the trial court held an initial hearing for Father, at which he appeared. Father admitted to the allegations of the petition and indicated that he had "challenges in his life" and did "not have stable housing." DCS Ex. 7. On April 12, 2016, the trial court held an initial hearing for Mother's husband. Mother's husband informed the trial court that he and Mother were divorcing and that Child was not his. Although paternity had still not been established, Father appeared as Child's alleged father and advised that he could not care for Child. DCS Ex. 8. Also on April 12, the trial court held a dispositional

hearing. On April 19, 2016, Father's paternity was established with DNA testing. Appealed Order at 5; Tr. Vol. 2 at 53.

[6] On April 25, 2016, the trial court issued a dispositional decree, ordering Father to do the following: contact the DCS family case manager ("FCM") weekly; participate in services recommended by the FCM or other service providers; maintain suitable, safe, stable housing; secure a legal and stable source of income; abstain from drug and alcohol use; submit to random drug screens; participate in homebased counseling; attend all supervised visitation; and undergo a parenting assessment and follow all resulting recommendations. DCS Ex. 9.[1]

[7] At some point, DCS filed a notice of paternity and motion to dismiss jurisdiction as to Mother's ex-husband who had been identified as Child's legal father. On January 25, 2017, the trial court issued an order granting DCS's motion to dismiss Mother's ex-husband. DCS Ex. 12.

[8] In February 2017, DCS filed a petition for the involuntary termination of parental rights. Mother agreed to termination of her parental rights. In April 2017, following a hearing, the trial court issued an order terminating services and visitation for Father. On May 16 and July 25, 2017, the trial court held a termination hearing. Mother signed a relinquishment of parental rights on May

---

[1] Although Father's paternity had been established on April 19, 2016, the dispositional decree required Father to establish paternity, presumably because paternity had not yet been established at the April 12 hearing on which the decree was based.

16 and did not appear on July 25. Father did not appear on May 16, but on July 25 he appeared in custody and with counsel and testified on his behalf, as did Grandmother. The FCM, the court-appointed special advocate ("CASA"), the visitation supervisor, and Father's therapist testified for DCS.

[9]     In November 2017, the trial court issued its order terminating Father's parental rights with the following *undisputed* relevant findings of fact:

> 29. Case management also focused on goals, including: behavior modification regarding responsible thinking skills, obtaining and maintaining employment and housing, obtaining and maintaining stability, and developing supports.
>
> 30. Father participated regularly in case management from June 2016 to August 2016 and made progress towards some of his goals.
>
> 31. In September 2016, Father became responsible for initiating case management sessions and stopped participating.
>
> 32. Although Father had made progress, Father failed to complete any case management goals ….
>
> 33. Father was never able to obtain and maintain stable employment or stable housing.
>
> 34. Between April 2016 and November 2016, Father was employed at three different jobs and was unemployed for several months.
>
> 35. Father's last employment was three months ago and it was only for three weeks.

36. Father is currently unemployed and does not have any means for providing for Child.

37. Father has never had stable housing throughout the CHINS case, which was one of the reasons for removal from Father.

38. Father has resided in several homes throughout the CHINS case and by his own admission has never been stable.

39. Father's only semi-stable home during the CHINS case was the Timothy House, a sober living facility.

40. Father complied with services and visits while at the Timothy House because of the structure and rules.

….

42. Father is currently incarcerated[2] and does not have stable housing.

….

48. Father's visitation never progressed to unsupervised due to his lack of progress in his ability to provide for Child's needs.

49. Father has not visited with [Child] since November 2016.

---

[2] Father was being held in the Vigo County Jail on a warrant issued by Marion County for criminal trespass. Tr. Vol. 2 at 47. Also, at the time of the second hearing on DCS's termination petition, Father had pending criminal charges for leaving the scene of an accident and for possession of paraphernalia in Clay County and two charges for criminal trespass in Vigo County. DCS Exs. 15, 16.

50. Father admits that he and [Child] do not have a bond.

51. Father is a stranger to Child.

….

65. CASA, Lindsey Mershon, agrees that it is in Child's best interest for termination of parental rights and adoption and that continuing the parent-child relationship between Father and Child would be harmful to Child.

66. DCS' plan for Child is that he be adopted and Child's current foster parent is willing to adopt.

Appealed Order at 6-14. The trial court concluded that there was a reasonable probability that the reasons for Child's placement outside Father's home will not be remedied, that termination of parental rights is in Child's best interests, and that there is a satisfactory plan for the care and treatment of Child, that being adoption. Accordingly, the trial court granted DCS's petition for termination of the parent-child relationship. Father appeals.

## Discussion and Decision

[10] "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016) (quoting *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005)). "[A]lthough parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental

responsibilities." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008). Involuntary termination of parental rights is the most extreme sanction, and therefore "termination is intended as a last resort, available only when all other reasonable efforts have failed." *Id.* Because "the Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children," we apply a heightened standard of review to termination proceedings. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016) (quoting *In re Adoption of O.R.*, 16 N.E.3d 965, 972 (Ind. 2014)).

> In considering whether the termination of parental rights is appropriate, we do not reweigh the evidence or judge witness credibility. We consider only the evidence and any reasonable inferences therefrom that support the judgment, and give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand. Where a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous. [Ind. Trial Rule 52(A)]. In evaluating whether the trial court's decision to terminate parental rights is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment.

*K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229-30 (Ind. 2013) (citations and quotation marks omitted).

A petition to terminate a parent-child relationship involving a CHINS must, among other things, allege:

> (B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services.

Ind. Code § 31-35-2-4(b)(2). DCS must also allege that termination is in the best interests of the child. Ind. Code § 31-35-2-4(b)(2)(C). DCS must prove each element by "clear and convincing evidence." *R.S.*, 56 N.E.3d at 628; Ind. Code § 31-37-14-2. If the trial court finds that the allegations in the petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

## Section 1 - The trial court did not clearly err in concluding that there is a reasonable probability that the reasons for Child's placement outside Father's home will not be remedied.

[12] Father challenges the trial court's conclusion that there is a reasonable probability that the reasons for Child's placement outside Father's home will not be remedied. In reviewing this determination, we engage in a two-step analysis. *K.T.K.*, 989 N.E.2d at 1231. First, "we must ascertain what conditions led to [Child's] placement and retention in foster care." *Id.* Second, we "determine whether there is a reasonable probability that those conditions

will not be remedied." *Id.* (quoting *In re I.A.*, 934 N.E.2d 1127, 1134 (Ind. 2010)). When the trial court makes its determination, it must evaluate a parent's fitness at the time of the termination hearing, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1231). "A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). The trial court may consider services offered by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. "Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re Involuntary Termination of Parent Child Relationship of A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need only establish 'that there is a reasonable probability that the parent's behavior will not change.'" *A.D.S.*, 987 N.E.2d at 1157 (quoting *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007)).

[13] Father argues that the termination of his parental rights was "largely based on [his] failure to complete services but such failure was prompted by the belated paternity determination, [his] temporary transportation and telephone issues caused by his poverty, and the overwhelming nature of the obligations placed on [him], a 'non-offending parent.'" Appellant's Br. at 5.[3] Father contends that his paternity was not established until February 2017, when Mother's ex-husband was dismissed from the case and that he was not motivated to complete services while his paternity was in question. However, the record shows that his paternity was established in April 2016, and there is nothing in the record that suggests that he was unaware of the DNA paternity test results until February 2017. He testified that he did not remember when he found out the results of the paternity test. Tr. Vol. 2 at 143.

[14] In addition, we disagree that termination of Father's parental rights was largely based on his failure to complete services; rather, his inability to obtain and maintain employment and housing was clearly significant to the trial court's decision. Child could not be placed with Father when Child was removed from Grandmother's care because he admitted that he had challenges in his life and did not have stable housing. Thus, to determine whether there is a reasonable probability that the reasons for Child's placement outside Father's home will not be remedied, we must consider whether there is a reasonable probability

---

[3] Father also challenges multiple findings of fact, but we need not address these challenges because we can resolve the issues he raises based on the undisputed findings.

that Father will be unable to obtain and maintain stable housing. Closely linked to this question is Father's ability to obtain and maintain stable employment.

[15] The trial court made findings, 33 through 40 and 42, relevant to Father's ability to maintain stable employment and housing, which Father does not dispute. As to housing, the trial court found that Father resided in several homes throughout the CHINS case, lived in semi-stable housing for only two months when he was at the Timothy House, admitted that he had never been stable, and at the time of the hearing was incarcerated and did not have stable housing. As to employment, the trial court found that between April and November 2016, Father was employed at three different jobs and was unemployed for several months and, at the time of the hearing, he was unemployed, had not worked for three months, and had no means of providing for Child. Although Father may have exhibited some temporary improvements, given his overall pattern of conduct, it was reasonable for the trial court to find that Father's situation would not improve. *See A.H.*, 832 N.E.2d at 570. As such, we find no error in the trial court's conclusion that there is a reasonable probability that the reasons for Child's placement outside Father's home will not be remedied.[4]

---

[4] Because of our resolution of this issue, we need not address Father's argument that the trial court clearly erred in concluding that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being.

## Section 2 - The trial court did not clearly err in concluding that termination of Father's parental rights is in Child's best interests.

[16]     Father also challenges the trial court's conclusion that termination of the parent-child relationship is in Child's best interests.

> [I]n determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by [DCS] and to consider the totality of the evidence.  In so doing, the trial court must subordinate the interests of the parent to those of the child.  The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests.

*In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009) (citations omitted).

[17]     Here, the FCM recommended that Father's parental rights be terminated and opined that it would not be in Child's best interests to be reunified with Father due to "the inconsistencies with where he's been living, inconsistencies with jobs, inconsistencies with visitation and case management … all the inconsistencies throughout the entire case."  Tr. Vol. 2 at 86.  Also, the CASA recommended termination of Father's parental rights because "he's [n]ever given us a reason to think that he could ever provide [Child] with a stable, loving, safe environment."  *Id*. at 130.  The CASA also testified that a

continued relationship with Father would "do [Child] harm" and that "[Father is] pretty much a stranger to [Child]." *Id.* at 130-31. Father does not challenge the findings that he and Child do not have a bond and that he is a stranger to Child. Given the recommendations of the FCM and CASA and our determination above that there is a reasonable probability that the reasons for Child's placement outside Father's home will not be remedied, we cannot say that the trial court clearly erred in concluding that termination of the parent-child relationship is in Child's best interests. Therefore, we affirm the termination of Father's parental rights.

[18] Affirmed.

Bailey, J., and Brown, J., concur.